With the attorneys who are going to make a presentation, please step to the podium and identify yourselves and the party you represent. Good morning, Your Honors. Michael Kujawa on behalf of the Appalachian City of Park Ridge. Lisa Jensen on behalf of the Appalachian City of Park Ridge. Good morning. We have allotted 30 minutes for this case. Time to be divided equally. The third member of the panel is Justice Pat Quinn, who could not be here this morning, but he will listen to the oral arguments. He's reviewed the case already and will make a decision in due course. Thank you. You can reserve time for your rebuttal. Thank you, Your Honor. I would like to reserve a few minutes for rebuttal. Good morning again, Your Honors. The City of Park Ridge was denied a fair trial in this case in four separate ways, each of which on its own would require a reversal of the judgment in the trial court or a remand for a new trial. Each of those four ways on its own. But when you look at the four arguments that we have together, and they all really link together in this case, it becomes readily apparent that Park Ridge was denied a fair trial and is entitled to a reversal of the judgment in the trial court or a new trial. Our four arguments and the four ways in which we were denied a fair trial, the first is the trial court's refusal to submit two special interrogatories to the jury, special interrogatories which were both proper in form and related to an ultimate issue of fact and would have tested a general verdict. Let's talk about that issue since you brought it up now, the sole proximate cause issue. Yes. You submitted a sole proximate cause instruction and the trial court granted that? Yes, Your Honor. But the trial court indicated that it was not going to give the sole proximate cause instruction, right? No, the court gave the sole proximate cause instruction. Not instruction, the special interrogatory. The special interrogatory, yes. So my question to you rather directly is, was that your defense of this claim at trial, that the presence of the opiates in the child's body at that time was the sole proximate cause of his death? Well, we have a... Sir, was that your defense? It was one of our defenses, yes. Okay. What does, and I'm not trying to be pedantic here, what does sole mean? Well, in this particular instance... What does sole mean? It means only. It means the only, yes, the only cause. The sole proximate cause was that the boy's father was contributorily negligent, right? Yes. So you're saying two different things. Well, I think what we were doing was asserting multiple defenses that don't necessarily have to cancel each other out. Well, I think one does cancel the other out when you're talking about sole or the only proximate cause. If you want the jury's answer to that question to possibly defeat a general verdict, then you can't have a defense that is completely inconsistent with it. And your defense of comparative negligence on the part of the father for his failure to give the proper medical history, whatever it is exactly that you said, that is inconsistent legally with the theory of sole proximate cause. I don't think you have a shot there. I appreciate your position, Judge. I do believe, though, that if there is, and there was evidence in this case to support the fact that the drugs that ended up causing the death of Joseph Ferio were taken after the 106 AM call and had nothing to do with... Where's that from? What is the evidence? Well, if you look at the fact that Dr. Tan plaintiffs sole proximate cause witness or proximate cause witness, testified that he could not say what type of opiates were taken, when they were taken, whether they were fast acting or slow acting. When you couple that with the evidence that when the Park Ridge paramedics arrived on the scene and did their visual assessment of Joey Ferio, he was awake, he was alert, he was oriented... Their assessment? Yes. That was an assessment from the foot of the bed? That was their assessment, yes. A professional assessment by the place's paramedics? That was the primary assessment that they did, yes. A visual assessment when they arrived on the scene. Based upon their assessment of Joey Ferio, he was awake, alert, oriented times three, and his ABCs were within normal limits. Couple that with the testimony from Larry Ferio, Joey's father, that after the paramedics left, he checked on Joey every 15 minutes, and Joey was sleeping normally, breathing normally, and everything was fine. And then the testimony from our expert, Dr. Konigsberg, that there was no signs of opiate toxidrome or overdose during the 106 a.m. call. All of that, when you put all that together, that is certainly circumstantial evidence that there was not drugs on board during the 106 a.m. call. It seems to me that if you wanted that to be your defense, that you could have solicited that kind of an opinion from your expert. I don't think there's anything in the plaintiff's expert that is inconsistent with the fact that there was not drugs taken after 106 a.m., and I don't think there is anything that was elicited in his cross-examination or in the examination of your expert that would provide the jury with any reasonable testimony that it was the consumption of opiates after your folks left the house that caused his death. I think, Judge, a party is entitled to have the jury instructed when there is evidence to support that instruction. And there was evidence in this case, perhaps not direct evidence, but certainly circumstantial evidence, to support us. But you got the instruction. I think an argument could be made that it was given in error, but you did get the instruction. And that is why, when we got the instruction, that's the evidence that there was evidence presented to the jury in this case which would entitle us to the sole proximate cause, special interrogatory. But going beyond the sole proximate cause, special interrogatory, the willful and wanton conduct special interrogatory was in proper form. It was related to the ultimate issue in this case was the conduct of Park Ridge in its response to the 106 AM call, willful and wanton, utter indifference or conscious disregard. That certainly would have tested the general verdict in this case. And when you look at what the way that you ---- What were the ways in which the plaintiff claimed your paramedics were willful and wanton, that they were reckless or consciously disregarded? Failed to assess and treat. Okay. So failed to assess. Yes. Next. I believe in the charging paragraphs it was failed to assess and treat together and then failed to transport. And correct. Maybe even failed to document the reporting aspect. Okay. Could the jury find that if, in the issues instruction, they don't have to find all three, they just have to find one of the three. Correct? Yeah. But in order to find one of the three, they have to find willful and wanton conduct. That's the lead-in statement. But when you put in the language, you know, the special interrogatory is a bit of a time bomb here. They come back with a verdict, and if the interrogatory is not answered in a manner that's consistent, it can blow up the verdict, right? Yes. So if you're going to plant a bomb like this, it had better be perfect. And my suggestion to you is that by using the vague word response, that you don't really test a general verdict with multiple issues of not negligent but willful and wanton conduct. And the word response was chosen because that is the word that was used in the 622 affidavit that was part of the complaint in this case. It was a word that was used to demonstrate the overall conduct of Park Ridge and its paramedics and its personnel during both calls. I don't know. You know, your paramedics did respond. They didn't do anything, but they did respond. They showed up. So I don't know how a special interrogatory that says, were they willful and wanton in their response, when they did actually respond and then didn't do anything. I don't know how that can test the verdict. I think it's too vague. The response starts when the call is dispatched and ends after the paramedics leave the scene. But doesn't Jablonski say that when you have alternate allegations regarding fault here, there are two allegations they made. They failed to assess and then they failed to transport. Doesn't the special interrogatory have to have at least the magic words that they failed to, they were willful and wanton in any of the ways alleged. And in this case, you didn't encompass both allegations. It was only the term of response, which could have been taken as, did they get there fast enough. I don't believe, based on when you look at this special interrogatory, in the context of all of the jury instructions, which is how we're supposed to look at it, I don't think you can say that anybody would ever be confused that we were talking about whether they got in their ambulance and showed up at the house and were they willful and wanton in that respect. There was absolutely no evidence or testimony presented that that was even an issue. It was their response. They are emergency responders, as their doctor referred to them multiple times in the 622 affidavit. It's how they phrased their allegations in their charging paragraphs and the complaints that were at issue in this case. Responded and did this. But the allegation of willful and wanton conduct was not on whether or not they responded. It was the way in which they didn't treat the young man. You talk about ABCs, they didn't even put pen to paper and put a couple ABCs down to indicate that they had made any assessment. I understand, but the word response encompasses the entire response to the call. Word response encompasses doing nothing in multiple ways. Well, it certainly does in this particular situation. The response was what did they do from the time that they got the call until the time that they cleared the call. And the evidence in this case was all about what did they do when they got to the front door and when they went inside. Your Honor, you asked about the Jablonski case, and I know what the Jablonski case says and the court's decision in that case. And I agree, it doesn't necessarily support our position right here, but I think a more fitting case, more applicable case, is the Morton v. Chicago case, 286 Illiop III-444, in which the special interrogatory was a police chase case and the special interrogatory was, which was determined to be improper form, testing of the general verdict, was the conduct of the detective or the police officer or both Willful and Watton. That's it. There were multiple charges in that case about what exactly they did that was supposedly Willful and Watton. Did they violate their stamp general orders and their procedures? But in that case, just like in our case, the very first hurdle that has to be cleared in those charging paragraphs is, was the defendant Willful and Watton in any of the following ways? And if the jury looks at that and says they were not Willful and Watton, they were not utterly indifferent, they did not consciously disregard, that tests the general verdict. That is a simple, clear, concise question on an ultimate issue in this case, and the Morton case is directly on point in terms of the special interrogatory that was asked there and found to be proper and compared to our special interrogatory. So I believe that it was, when you consider the special interrogatory on Willful and Watton in the context of all the jury instructions, I don't believe there was any confusion. I think response was the appropriate word to use. Again, I keep going back to the complaint and the doctor's affidavit, but it was, the doctor's report, it was the failure of emergency responders, and it was they responded to the request for EMS. Everything that we do when we get on scene is part of our response. It's an emergency response. That's why the term response is the appropriate term, and the appropriate term in the context of the jury instructions and all of the evidence that was presented to the jury in this case. If I can talk for a second about the clear error and abuse of discretion that occurred when the trial court allowed plaintiffs to read the evidentiary error or the evidentiary admission. When this case was first filed back in 2005 or 2006, on the first complaint that was filed and on the amended complaint that was filed, we filed a motion to dismiss based on both 2615 and 2619, and as we have to do in a 2619 motion, in our 2615 motion, we accepted the allegations as pled in the complaint. Is that what was read to the jury? That even accepting these allegations as true, we provided no treatment, is that what was read to the jury? Is that what was in your reply brief? What was read to the jury was that although we responded and showed up between 111 and 118, we provided absolutely no treatment, assessment, diagnosis, or transport. I think if you had had the language that was, if the position of your reply brief was exactly as you're saying here, accepting these as true, which you have to do, and we understand that for the purposes of the motion, then we provided no treatment. But that's not what was read to the jury, and that doesn't seem to have been your position at that time. It seemed to be your position at that time that providing no treatment was, in the grand scheme of things, a good thing for you because it might get you out of the case on an immunity ground. Wasn't that what you were aiming for at that point in time? We felt that the allegations in the complaint pled directly into 6105 and 6106 immunity. And we don't get to decide what the playing field is going to be when that complaint is filed. The plaintiff's counsel decides what allegations they're going to make, and they put them down and they file their complaint. And we get it, and we look at it, and it pleads directly into 6105 and 6106 immunity, which we asserted. But it's a statement of fact. We didn't provide any medical care, and the record is clear. We didn't provide any medical care. That's something that they did not plead in their complaint. But they did. They did. They said you didn't assess and you didn't transport, but they didn't say you didn't provide any medical care whatsoever. Well, what we said was we provided no assessment, no treatment, no diagnosis, no transport. You made a sweeping statement, though, a more sweeping statement. I don't believe it's more sweeping than what was put in the doctor's affidavit, which was part of the statute or part of the complaint. Let's look at the actual language that was read to the jury. That's what your beef is about here. Yes. Yes. Let me get what was read to the jury exactly, Your Honor. Your Honor. It says, quote, provided no medical care of any kind, including evaluation, assessment, diagnosis, treatment, or documentation. That, you know, that's what was read to the jury, and that is not what I think you're trying to represent to us here this morning. What we took was the allegations in the complaint and argued those in our reply memorandum. As you can see, at every level in this case on the motion to dismiss, the court questioned the allegations and talked about how unusual they are and what a strange situation this was. As Judge Flanagan in her written order granting the motion to dismiss, it said, in this case, the paramedics failed to provide any evaluation, assessment, examination, diagnosis, treatment, or documentation. This is both alleged in the pleading and contained in the physician's report. There was nothing in the proposed amendment to the pleadings which altered this. That was the order that was overturned by the Supreme Court, though, right? Right. But both the appellate court and the Supreme Court pointed out that the allegations here are that we showed up and did nothing. And apparently, you know, they were saying that that was unusual because usually when paramedics show up, they do something. Well, and we did do something, which is the evidence that was presented at the trial. But when we're faced with a 2619 motion to dismiss, and we have to accept the facts as true if we want to assert our immunity. I mean, what's going to happen here is municipal defendants especially who are entitled to tort immunity defenses are going to have to worry about, well, I've got the complaint. It pleads directly into supervision immunity or recreational property immunity or whatever the case may be. But I'm worried that if I don't prevail on this motion to dismiss, or maybe I even do prevail as we did in this case, and at some point in time it gets overturned, that by accepting the allegations as true in the complaint, which I'm required to do under 2619, I'm going to have them read later on to the jury as an evidentiary admission. In particular, in this case, when you look at when it was done, in rebuttal argument or rebuttal. Well, it did rebut what you claimed. I mean, didn't you claim at trial that when they showed up and stood at the foot of the bed and ruled out asthma and assessed him and left and never filled out a run report and submitted some phonied up documents later? That was what was offered in rebuttal. That seemed to rebut what you tried to defend the case with. Well, I read the record. I know you did, Your Honor. I read the record. And I don't think that the jury was all that favorable in its review of the fact that the paramedics came out and did what they did or failed to do anything. I think it's hard to read the record any other way. Well, I believe, Your Honor, that what the paramedics did was what was wanted of them that night and was within what they were supposed to do based upon their standard operating procedures. What do you mean, what they wanted? What do you mean? What the family wanted to do. Is that the way emergency medicine is supposed to be practiced? No. I don't want to get into an argument with you, but, okay. The facts in this case were hotly contested in terms of who said what during the 106 AM call, who did what during the 106 AM call. But the evidence presented to the jury was that when the paramedics arrived, they did their primary assessment, a visual primary assessment. I acknowledge they never laid a hand. But one of the reasons why the facts were so hotly contested is that your paramedics didn't do their job. They didn't fill out any reports to indicate, you know, say he didn't have asthma. I looked at him. He didn't have asthma. Well, you have to follow the asthma protocol. They didn't do that. They didn't fill out any reports at all. I think that we're getting into the idea of what is a paramedic supposed to do when they get there. And what they're supposed to do is use their discretion based upon the facts and circumstances that they find on the scene. And that's what these paramedics did. They got a call, a 15-second dispatch of a 15-year-old unconscious, sounds like asthma, and that is not what they found when they got on the scene. What they found was a father who was telling them that I overreacted and everything's fine, which is evidenced by his conduct at the end of that 911 call at 106 a.m. That's the Larry Ferriero that they encountered when they got there. They didn't encounter an unconscious 15-year-old when they walked in. They had a conscious 15-year-old who sat up in bed when they turned on the lights, responded appropriately to the questions that his father was asking. They looked at him. They could tell based upon their visual assessment that his ABCs were within normal limits. But when they got there and found that the 15-year-old was no longer unconscious, they had to think there must have been some mistake with that transmission, or then they would have to say, well, Father, why did you call 911 in the first place? Wasn't there evidence that they were required to at least find out why was 911 called? Well, when they got to the front door, the father told them I overreacted. I apologize. But why did he overreact? What caused him to overreact? Well, he thought his son was having a problem. As you can see, there's evidence in the record from both the doctors, Dr. Rudnick and Dr. Stubnicki, that they have noted in their medical records during the treatment of Joey when he was in the hospital that when the paramedics, one of them noted that the boy was making snoring sounds, but he was arousable and there was not needed hospitalization. I think the difficulty we're having here is that, you know, you're talking about the different standards of proof for negligence, and then you go up for Wilflin-Wanton, and then the third level would be intentional. And it clearly was your position at trial that your paramedics weren't even negligent, but there's plenty of evidence presented here that they intentionally, intentionally did a lot of things wrong and tried to cover up for it later. So I think, you know, when you're talking about getting a JNOV or there wasn't evidence of Wilflin-Wanton conduct, I think there not only was evidence of negligence in Wilflin-Wanton conduct, but also intentional conduct here by the paramedics. It's in the record. I know you read the record, Your Honor, and I respectfully disagree. I do not believe there was evidence of intentional conduct. I think perhaps somebody, certainly as I tried to make clear during closing arguments to the jury, this is a, you can dispute or disagree with how the paramedics handled this call when they got there in their response to the 106 AM call. You can say they should have done more, they should have done something different, and granted, they should have documented it, and they didn't. That was a communication error and just a mistake that was made after the fact. But they did show up. They did ask to see the boy. They did do a primary assessment of him. They did check him out. And when they left the house that night, Joey Ferriero, he was alive. He was awake. He was alert. He was oriented times three. He was in his own bedroom under the watchful eye of his father who stood there and testified that he sat there for the next two hours and checked on him every 15 minutes like a newborn baby was his testimony. And I'm just going to suggest that if your paramedics had followed their protocol and taken a medical history, done an assessment, put their hands on the child, done an evaluation of the child, and filled out a report indicating their decision-making process as to why they weren't going to bring him to the hospital based on the history that had been provided and everything else, you might have been in a different position at the time of trial. That's not the position you were in, though. Your Honor, I still would assert that this does not rise to the level of utter indifference or conscious disregard, the knowing that our conduct right now, our conduct right now is going to result, is a high probability of resulting in injury to the person we're dealing with. And that's really the standard when we're talking about Wilflyn Watt. Did they know? Was there this high probability? All right. Thank you. Ms. Jensen. Good morning. I represent Joanna Bruzzo, Independent Administrator of the Estate of Joseph Furio. May it please the Court. I would like to jump right into the arguments that my opponent has made today, and I will first start with the special interrogatories. I think that the issue of arguing that it was a proper and appropriate special interrogatory to ask whether the sole proximate cause of Joey Furio's death was his ingestion of cocaine or opiates on October 31, 2004, that was clearly an improper special interrogatory. What was your objection, though? Well, our objection was that it was merely duplicitous of the sole proximate cause argument that had been put into the jury instructions, that it was not necessary. As an experienced trial lawyer, you understand the potential impact in terms of reversible error for the failure of the trial court to give a properly phrased special interrogatory, right? Absolutely, Your Honor. And one of our strongest arguments, and was argued both in the jury instructions and with respect to the special interrogatory, had to do with the fact that you cannot, as a matter of law, have the condition which causes you to present for medical care be the sole proximate cause in a medical malpractice case. Well, but your reference, your citation in your brief for that point was the Kirklis case, right? Right. That's not what the Kirklis case says. You're right. The Kirklis case, the facts... I mean, the way, with all due respect, and I have respect here, what you cited the Kirklis case for, and the words that you used were, as a matter of law, what you wrote in there is not accurate. Well, Your Honor... As a matter of law, the Kirklis case actually did hold that... As to comparative negligence. Right. As to comparative negligence for the patient, not as to sole proximate cause. Well, but I believe, Your Honor, that if, as the Kirklis court said, courts have not allowed evidence of contributory negligence in cases where a patient negligently creates the need for treatment. If that can't be contributory negligence... But that's not what you said in your brief. Okay? I think the sole proximate cause interrogatory was improper for other reasons, but the Kirklis case doesn't give you any support. The Kirklis case, I think if you read it, says a little bit the opposite. Actually, the Kirklis case says that if you are negligent in leading up to the... and was following the medication regimen when, in fact, he wasn't. And the argument was that he was contributory negligent for not... for misinforming his doctor. That's completely different than saying he had hypertension, therefore he had high blood pressure, therefore he must have been eating badly, he was negligent. And so... My complaint or my problem with what you wrote in your brief is on page 22, and I'll read the sentence because I don't think this is what Kirklis says, and you did not give us a page reference for the statement that you made. And you state, quote, as a matter of law the ingestion of drugs could not be the sole proximate cause of Joey's death where it creates the need for treatment that is at issue in the case. Kirklis did not say that. They're two separate issues, negligence, causation. Kirklis did not say that. Your Honor, I respect your reading of that, and I believe that if, as a matter of law, if negligent conduct that creates the condition that requires medical care, if that cannot be argued as an element of contributory negligence, how could it ever be argued as the sole proximate cause? Well, maybe that's what you would like the law to be. I would, Your Honor. I would like the law to be that. That's not what Kirklis said. That's not what McDonnell v. McPartland and any number of other cases on this issue have said. I have not found any case law that says that negligently creating a condition for which you present to a doctor can be the sole proximate cause. We know it wasn't the sole proximate cause in this case because Dr. Tan testified that he was under the influence of opiates at the time of the 106 call, and if he had been transported to the hospital, he would have lived. So it could never be the sole proximate cause of his death, the ingestion of drugs, because there was another element of a cause for his death, and that was the fact that he wasn't transported to the hospital. And no one testified to the contrary. No one testified that he still would have died even if he had been transported to the hospital. So there's no way that his ingestion of drugs in this context, in the context of a medical malpractice case where the paramedics were presented with an opportunity to save his life. But he did die of a drug overdose. He did die, just like people die of cancer. But when you go to the doctor with symptoms and they don't diagnose you, the sole proximate cause of your death is not cancer. It's the fact that you were misdiagnosed. So I think that this is an area of law that needs to be decided. If you don't believe Kirklis said that, I respectfully disagree, but I think that the law needs to be clarified, because Kirklis cited to a number of other states that have very clearly said that. On the issue, and this is something I've written about, on the issue of comparative negligence, not on the issue of sole proximate cause, Kirklis actually has language in it that is exactly to the contrary of what you cited it for. Thank you, Your Honor. I do believe, though, that it's important for this court to recognize and perhaps rule today that the underlying cause for which someone goes to the doctor, whether that underlying cause is negligently created or not, can never be the sole proximate cause of someone's death. And certainly it was not the sole proximate cause of Joey Furio's death, because, as I mentioned, had Dr. Tan testified that had he been transported to the hospital, he would have survived. The second special interrogatory on willful and wanton conduct, as the trial court ruled, was so vague that it could not test me. Was that your objection at trial? My objection at trial was that it was improper in form. I don't believe that I argued that it could not test the verdict, but as you know, Your Honors, you can uphold the court's ruling on any basis. No, I know that. I know that. I'm just trying to put myself in the position of the trial judge, wondering what the plaintiff is complaining about here. Why is it improper in form? I know you made that objection, but that's all you've said.  But the fact that he talked about the response, as I set forth in my brief, all that could do was confuse the jury. It could not test the verdict. As I argued in my brief, the jury could have ruled that the paramedics were not willful and wanton in their response, where they determined that they responded timely, and still have rendered a verdict in favor of the plaintiff where they ruled that they responded timely, but once they responded, they willfully and wantonly failed to evaluate, assess, or transport. And the Jablonski case, as well as some of the other cases that I cited in my brief, clearly indicate that the special interrogatory has to be meticulously worded so that it can absolutely test the verdict. Jablonski held it is imperative that the special interrogatory be carefully worded so that there is no question that an inconsistent answer is absolutely irreconcilable with the general verdict. And as I mentioned here, there's a very easy way to see how that could not happen, where they ruled that their response was timely, but their conduct after they arrived was willful and wanton. I also pointed out that they used the wrong definition of willful and wanton conduct, so there were a multitude of reasons for which the trial court was acting appropriately when they refused that special interrogatory. There are two other issues we want you to address, I believe, my colleagues and I. The first one is the admission, taking something from a reply brief from way back when and sort of putting it in front of the jury right before closing argument, and then we want to talk to you about damages. Okay. Sure. Go with the former first. Okay. On the evidentiary admission, Your Honor, the first amended complaint, which was the operative complaint at the time defendant filed its motion to dismiss, made three allegations of willful and wanton conduct. One was that they never evaluated or assessed the patient. Two was that they never transported the patient to the hospital. And third, they failed to prepare a run sheet. Those were the three allegations of willful and wanton conduct. There is no quarrel with the fact that they are required to take those allegations as true for purposes of their motion to dismiss. But that's not what they said. They went far beyond the allegations of the complaint, and the trial court correctly ruled that they were not simply admitting the complaint for purposes of their motion to dismiss. They were, in fact, making affirmative statements of fact. Help us out for a minute, because in reviewing the transcript, it was a little difficult to sort of reconstruct, you know, when this came up. Did you bring it up as a motion to eliminate, that you wanted to have this admitted and the judge delayed ruling or just was thinking about it until she heard all the evidence? How did this unfold? It was initially a motion to eliminate where we asked that it be a judicial admission, based upon the number of cases that said that, you know, once you make a statement like that, it takes the issue away. And we brought that in the beginning of the case, because had she granted that, we would not have had to put on half of the testimony that we did, that they didn't provide any care. She took that under advisement and ultimately, during the pendency of the trial, ruled that it was not a judicial admission, but she would take under advisement and take additional arguments on whether it was an evidentiary admission, and we argued that. And then she ruled, prior to the close of evidence, that she would allow it in as an evidentiary admission when we pointed out that it was crucial that we use that statement to rebut. Shouldn't they be allowed in a reply brief where they're trying to assert immunity to not only accept the allegations of your complaint, but to put a little polish on it and call it something even that has a little more depth to it, fail to provide any treatment at all? I'm curious as to why what they did is so improper that it would rise to the level of an admission. An evidentiary admission is simply an inconsistent statement of fact taken at a prior time within the trial. Yeah, but it's not like you're reading an impeachment, you're impeaching a witness, you were at a deposition, you were sworn to tell the truth. Here, you read it to the jury, the court instructed the jury as to what it was and what significance it had. It wasn't really much of a limiting instruction, but more in the form of they admitted this in a pleading. Well, it would be no different, Your Honor, than if I stood up in rebuttal and in rebutting their argument read a statement out of their answer. I stood up and said they contended in their case that they did ABC, but in their answer they denied that they did ABC. I mean, it's the same thing. But no, the argument in a reply brief to a motion to dismiss is a little bit different than an answer, isn't it? I mean, they're making an argument that combines the allegations of the complaint and the law as it relates to the case, and they're talking about the facts of the case, and they characterize the facts, I think is the best way to phrase it. Why aren't they allowed to do that? Because if you make affirmative statements of fact to the court, not only the trial court, but this court and the Illinois Supreme Court, where you are arguing to them to buy your position, buy my position that there is immunity, and distinguish my case from Anacucci, where the court said we cannot decide whether immunity applies at the pleading stage because there simply is not enough information, where you stand up in front of those courts and you make affirmative statements of fact, this is unlike Anacucci because the record here is clear. We provided no care. They're making an argument to the court. They're putting, as I mentioned, all their eggs in one basket. This is it. We are going to do what we can. But they were consistent with the eggs that you were playing with as well. They were not, Your Honor. The case that you presented to this jury was that they failed to provide any treatment at all. That's what they said in their – they're dealing with the same facts the way that you presented it to the jury. But that's not what we pled in the complaint, and we're talking about – No, I understand that. I'm talking – I'm comparing apples to apples here. What you presented at trial was exactly what they said in their reply brief many years ago. That's right, because that was the truth. Why would that rise to the level of an evidentiary admission that you could read to the jury right before closing argument? Because they were telling the truth, it's my contention, when they argued to the Illinois Supreme Court that they provided no medical care. They wanted the record to be clear. We have provided no medical care, therefore we must be immune. And then when they lost that argument, they turned around and changed their story, even though they had taken sworn statements from their paramedics shortly after the occurrence where they said they provided no assessment. They did a 180, and now all of a sudden they provided care. And you – if you read the decision on the post-trial motions – You can use the sworn statements. We did. We used the sworn statements, and that was one of the other arguments why there's certainly no error here, because it was simply cumulative of all the other evidence that came in at trial that they admitted they did know assessment. Your colleague would suggest that it's not cumulative, especially when it was delivered in the manner and at the time that it was delivered. I think that, as I mentioned, just as I could stand up and read any evidentiary admission in rebuttal, whether it be a pleading or a portion from a deposition, if it rebutted their argument where they stood up and in their case argued now that they did provide assessment, that they did provide medical care, that it was the perfect place for me to show the jury that – to rebut that statement. And the trial court gave them the opportunity, as must be given in every evidentiary admission, to explain that. They were allowed to get up after me and explain that statement. So it was all perfectly appropriate by way of using this as an evidentiary admission. I would contend that it rose to the level of a judicial admission based on some of the cases that I cited to you. The court didn't even go that far and gave them the opportunity to rebut this. And as I mentioned in my brief, it was so cumulative of the evidence. The court even pointed out in her post-trial decision – If it's that cumulative, maybe it was, you know, unnecessary. Hindsight is 20-20, Your Honor, but at the time I believed that it was necessary, given their argument at trial that standing in the hallway for 10 seconds and looking at this 15-year-old was a visual assessment. I hear you. What about damages, the damages argument that's made here? The damages, Your Honor, I think were perfectly appropriate and well-reasoned. We had three categories of damages that the defendant is unhappy about, is contesting. The first is pain and suffering. And their big argument, their only argument, is that once Joey Furio, after being in cardiac arrest and respiratory arrest for over an hour at the hospital, once his heartbeat was finally resuscitated, he was in such a deep coma that he couldn't feel pain. I will grant you that. But that's not where the evidence of pain and suffering is. Can you point us to anywhere in the transcript, your expert, Dr. Tan, for example, where he said that anything that the child went through prior to going into a coma was a competent cause of him suffering pain? The word pain. He did not use the word pain, Your Honor, but I would suggest he used the word agonal breathing. Agonal breathing. That is the agonal, the sound of someone who right before they stop breathing because not enough oxygen is being delivered to keep the brain alive, that is agonal breathing or a type of agony that the body goes through. I know the word was used. Was that defined in the way that you're suggesting? It was, Your Honor. He talked about agonal breathing being that breathing, those last gasps before breathing stops. And it's a form of suffocation, just as if you're being smothered with a pillow, that once your body slows down its breathing so much and the breathing turns agonal, that's a sign that you're about to stop breathing. And once you stop breathing for a point in time, you're not unconscious. You just are not breathing until the point where your brain, where you go into cardiac arrest. Now, perhaps, you're unconscious, but we're talking about that point in time up until he loses consciousness. What about the damages awarded for loss of a normal life and the survival action? I don't mean to in any way deprecate anything that anybody went through here, please. But for that period of time, the amount of money awarded, what's your response to the argument made by your colleague? Fifteen-year-old, healthy, athlete, active. That's the type of person we're talking about who is now relegated to a coma, where he cannot breathe on his own. He is attached to a respirator. He has a catheter in place. He cannot eat. He cannot talk. He has to have secretions wiped away from his face and mouth. He was in this condition for two days before he died. Now, it would be nice to be able to make a mathematic computation, as defense counsel did, and say, well, the jury's verdict computes to X number of dollars for every hour he was in this condition. But this court and the Illinois Supreme Court has cautioned against that. You present that evidence to the jury and let them decide what they think this was worth. And I would contend that it certainly doesn't shock the conscious or indicate anything other than their recognition that this was a vital, young, active, athletic boy who is now hooked to a life support system and laid there in that bed in a vegetative state for almost two days. And I don't think there's anything about that award that shocks the conscious. Thank you. Thank you. Mr. Kajawa. Very briefly, Your Honors, in rebuttal. As far as the special interrogatories go, on the sole proximate cause special interrogatory, the question is, was there evidence that drugs were on board within Joey Ferial at the 106 a.m. call, or was there evidence that there were no drugs on board at 106 a.m. and those drugs were taken after the 106 a.m. call? And there is circumstantial evidence on both sides. Dr. Tan testified that he felt he was having an opiate toxidrome prior to the paramedic's arrival at 106 a.m. Dr. Konigsberg disagreed. And we know, based upon what the paramedics saw, their evaluation and assessment of Joey Ferial at that time, and then Mr. Ferial's testimony, that everything was fine for the next two hours. There's circumstantial evidence which shows that the drugs that ended up causing the death of Joey Ferial were consumed after the paramedics left following the conclusion of the 106 a.m. call. That's what makes that sole proximate cause special interrogatory an appropriate special interrogatory to test the verdict. As far as the willful and wanton conduct one goes, there was no evidence placed on in this case, and it was never even an issue as to whether the response, as Ms. Jensen wants to term it, being their driving from the firehouse to the house was untimely, or whether they didn't do it appropriately, were they willful and wanton in that particular regard. There was absolutely no issue about that as the response. The word response was used quite a bit during the... I don't know. One of the things that even you brought up was the situation that the paramedics found themselves in, in terms of the information that was given to them from their dispatch. They only had a 15-second conversation about dispatch. That involved the response. What was their response to getting this 15 seconds of information? To me, it seemed like you were indicating that they were a little bit behind the eight ball because they weren't given enough information from your own dispatcher. No, I think that the testimony was that this is a normal dispatch. They don't get a whole lot of information from dispatch, nor do they put a whole lot of weight in terms of deciding what they're going to do when they arrive on the scene based upon what dispatch tells them. They get all sorts of dispatches which provide some level of facts as they're taken in in the very first seconds of a phone call, and then they're dispatched out. And they oftentimes arrive to find a very different scene, which is what they had here. So the word response was used both in the complaint, in the doctor's affidavit, in the testimony in this case, to refer to what the Park Ridge paramedics did at the 106 AM call at the Ferial House. It is not vague. It is an appropriate special interrogatory, and it should have been given to test the jury's verdict on Wilflin 1, especially when we had a jury that was providing damage awards, I believe, based on passion, prejudice, sympathy, but not on the evidence in this case. They were inflamed by the fact that we had a three-week trial in which we presented testimony throughout the trial that we showed up, we followed our primary assessment, we came in, we did our visual assessment, we did our scene survey, we walked in, we gathered information from the father, we observed the child, there was a question that was asked of the child. I understand people disagree whether we should have done more, but the question is whether it was Wilflin or not. But we presented evidence, expert testimony. I don't follow you on the jury was inflamed. I mean, the jury heard two different cases. They apparently believed one and didn't believe the other. Right, but just before closing arguments, after we had presented three weeks of testimony describing for everyone the assessment we did, what we did when we arrived on the scene to have plaintiffs stand up in closing argument and read, oh, by the way, back in 2006. You're saying that they were inflamed because of this? Yes. In 2006, ladies and gentlemen, the city of Park Ridge said, we provided no medical treatment of any kind, no assessment, no evaluation, no treatment, no diagnosis. And you can see what was done with that in rebuttal. The trial judge gave them a club and they used it in a rebuttal argument to beat us senseless. And that's the danger of that evidentiary admission. And counsel says this was perfectly appropriate. It was completely inappropriate, and especially the prejudice caused by giving it at that particular time. But she called, counsel just called what we said in the reply memorandum an affirmative statement of fact. We can't even make statements of fact in contesting a complaint under 2619. We have to accept the allegations as true. And that's exactly what we did. That's what the trial court agreed we did. That's what this court agreed we did when they affirmed the trial court. And that's even what the Supreme Court agreed we did, even reversing it and saying go back and apply the EMS Act and not the Tort Immunity Act. That's what makes this such a clear abuse of discretion and so prejudicial, as you can see by the damage awards that were given when there was no evidence to support them. The 1.556 million for pecuniary loss, not the standard pecuniary loss of society companionship, but loss of money, benefits, goods, and services. There was no evidence presented to the jury which would ever allow a jury to come to a reasonable conclusion that 1.5 million was compensation for that element of damages. It has no reasonable relationship to the loss suffered. Same thing with loss of an arm. What was it you suggested, 260 or something? Yes. And what was that? What was the rationale for that? Where did you get that? I can't remember from the argument what it was that you. My argument to the jury was that when we're talking about the age of this child and the evidence in this case, there was substantial evidence presented about all the things that the Furios did with their son in the years prior to his death. Okay? And they got to have all those experiences. And you don't compensate them for that, for what they did with their son. What you're supposed to be compensating them for under the law of damages is what are they going to lose out on. And certainly there was an award for loss of companionship, loss of society. We didn't ask for a remitter on that in terms of the damages on that. We're talking about benefits, goods, services, money. There was no evidence presented, especially evidence to support a judgment of 1.5 million. And then when you look at loss of a normal life, it's at most 36 hours from the time the worst-case scenario, from the time the paramedics left the house following the 1.06 a.m. call to the time of death in this case. And pain and suffering, this agonal breathing, you don't have to be conscious to have agonal breathing. The testimony, though, that's in the record indicated, without getting too graphic here, that the mechanism of death going into the coma, rather, would be suffocation. I don't think there's anybody in this courtroom that would say suffocation is not painful. I agree, but if the person is not conscious, there can be no conscious pain and suffering during that time period. I'm talking about before he goes into the coma, before that. And for all we know, he was asleep at the time, just as he was asleep when his dad went in the first time. So thank you. Thank you. I enjoyed the case. It was very well argued and very well briefed. A decision will be issued in due course. Thank you. Thank you.